**UNITED MINE WORKERS OF AMERICA et al.**

**v.**

**PATTON et al.**

**No. 6699.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 6, 1954.

Decided March 15, 1954.

744

Stuart B. Campbell, Wytheville, Va., and M. E. Boiarsky, Charleston, W. Va. (Harrison Combs, Washington, D. C., on brief), for appellants.

Robert T. Winston, Jr., and Fred B. Greear, Norton, Va. (Greear, Bowen, Mullins & Winston, Norton, Va., on brief), for appellees.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is an appeal from a judgment in favor of plaintiffs in an action to recover damages under the provisions of the Labor Management Relations Act, 29 U.S. C.A. § 141 et seq. Plaintiffs are partners who were engaged in conducting a mining operation in the coal fields of Western Virginia. Defendants are the United Mine Workers of America and District 28 of that organization. The basis of the action is that the defendants by a strike at the mines of the Clinchfield Coal Corporation caused that corporation to cease doing business with plaintiffs and that this resulted in the destruction of plaintiffs' business. There was a trial before a jury which found in favor of plaintiffs and awarded them actual damages in the sum of $150,000 and punitive damages in the sum of $75,000. From judgment on this verdict the defendants have appealed. Four principal questions are presented by the appeal: (1) whether the evidence was sufficient to take the case to the jury, (2) whether punitive damages were recoverable under the statute; (3) whether there was prejudicial error in the admission of testimony; and (4) whether there was prejudicial error in the charge of the court.

1. The Sufficiency of the Evidence.

[1] We think that the evidence adduced was amply sufficient to take the case to the jury with respect to the liability of both defendants for the damages which plaintiffs allege. The facts are that the plaintiffs in the year 1949 purchased from one Willard Moore the mining equipment at the Laurel Branch Mine, a truck mine which was being operated by him on the coal lands owned by the Clinchfield Coal Corporation, and acquired from the corporation a lease on coal lands which would enable them to continue the operation of the mine. The lease was cancelled in October 1949 pursuant to the terms of a cancellation clause, but plaintiffs were allowed to continue the operation of the mine from day to day until Nov. 26, 1949. Clinchfield was operating its mines on a union basis, but was having labor trouble because a number of truck mines upon its property, including that of plaintiffs, were being operated non-union. It is a fair inference from the testimony that the cancellation of plaintiffs' lease was because of this trouble. Upon receiving notice to discontinue mining operations at their mine, plaintiffs inquired of Clinchfield's production manager how operations could be resumed and were told to get in touch with the field representative of District 28 of the United Mine Workers. They did this and entered into an agreement with him to operate the Laurel Branch Mine on a union basis. A collective bargaining contract was accordingly entered into with District 28 and the mine again began operating.

Shortly after operations at the mine had been resumed, plaintiffs were told by one Rush, the land agent for Clinchfield, that they would be given by Clinchfield a three year non-cancellable lease on the coal lands that they were operating.

They signed such a lease which was tendered them by Rush and left it with him to be completed by the signature of the proper officer of Clinchfield and the attachment of a survey setting forth the lands which it embraced. The lease was signed by the proper officer of Clinchfield but it was never completed by the attachment of the survey and was never delivered to plaintiffs.

In the course of the conversation with Rush, plaintiffs inquired whether they would have to operate the mine on a union basis and were told that that was a matter for them to decide. Following the conversation they decided to operate non-union and so notified their employees. Similar action was taken by other truck mines; and the union, blaming Clinchfield for this action, called strikes in mines operated by Clinchfield for the purpose of forcing unionization of the truck mines, thinking that they could accomplish this by force exerted on Clinchfield, as the truck mines were on the property of Clinchfield and their product was handled at the Clinchfield docks. These strikes lasted approximately a week, after which the men went back to work but with a threat from the union that, if the non-union operation of the truck mines was not ended within a week, the strikes would be resumed. Clinchfield thereupon notified plaintiffs to cease mining operations and plaintiffs, not having received the lease for which they had negotiated, and thinking that they had no right to continue mining on Clinchfield's property, desisted from further operations and sold their mining equipment to Clinchfield. There is some conflict in the testimony as to whether mining operations were voluntarily abandoned by plaintiffs or whether abandonment was forced by the demand of Clinchfield brought about in turn by the strikes and threats of the union; but when the evidence is viewed, as it must be on motion for directed verdict, in the light most favorable to plaintiffs, there can be no question but that there is substantial evidence to support plaintiffs' contention.

On the question of damages the evidence is that plaintiffs purchased the equipment of Moore for $25,000 paying only $10,000 in cash and the remainder on a tonnage basis as their mining operations went forward. From March 1949 to March 1950 they returned net income as a result of the operations of approximately $47,000 and contend that the actual profits were in excess of $60,000. They introduced a witness who estimated the profits for the remaining months of the three year lease at $125,274.92, based on the old operating costs and the current price of coal, and at $232,289.62, based upon reduced cost of operations considered possible.

On these facts we think that the case was one for the jury under § 303(b) of the Labor Management Relations Act, 61 Stat. 158, 159, 29 U.S.C.A. § 187(b) which provides:

"Whoever shall be injured in his business or property by reason or [of] any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of section 301 hereof without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

There was certainly evidence tending to show a violation by defendants of section 303(a) of the Act, 61 Stat. 158, 29 U.S.C.A. § 187(a), which provides:

"It shall be unlawful, for the purposes of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is—

"(1) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;

"(2) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9 of the National Labor Relations Act."

■ The chief argument of defendants in support of their motion for directed verdict is that there is no evidence that they authorized or ratified the strikes upon which plaintiffs rely for recovery. It is true that there is no evidence of any resolution of either the United Mine Workers or District 28 authorizing or ratifying the strikes. There is evidence, however, that the strikes were called by the Field Representative of the United Mine Workers, who was employed by District 28, and that he was engaged in the organization work that was being carried on by the international union through District 28, which was a mere division of the international union. Members of the union are members of local and district unions as well as the international; and of the $4 monthly dues paid by them, $2 goes to the international union, $1 to the local union and $1 to the district organization. It is clear that in carrying on organizational work the field representative is engaged in the business of both the international union and the district and that both are responsible for acts done by him within the scope and course of his employment. Stockwell v. United States, 13 Wall. 531, 545–548, 20 L.Ed. 491; Hindman v. First Nat. Bk. of Louisville, 6 Cir., 112 F. 931, 57 L.R.A. 108; Oman v. United States, 10 Cir., 179 F.2d

738; United States v. Waters, 7 Cir., 194 F.2d 866; Jefferson Standard Life Ins. Co. v. Hedrick, 181 Va. 824, 27 S.E. 2d 198; 2 Am.Jur. 279; A.L.I. Restatement of Agency, sec. 212. The relationship between the international union and the district organization was pointed out by the Supreme Court of Appeals of Virginia in United Const. Workers v. Laburnum Const. Corp., 194 Va. 872, 75 S.E.2d 694, 703–704, where the court said:

"United Mine Workers of America is a labor organization with approximately 650,000 members who are primarily engaged in mining and processing coal at the mines. District 50 United Mine Workers of America has a membership of 112,-000, which is largely made up of workers who convert coal into chemical constituents, such as dyes, drugs, plastics, etc. A part of its charter fees, intiation fees and dues is paid to the United Mine Workers of America. According to defendants' brief, 'Its members are part of UMWA, but retain their identity, membership rights and privileges at all times as members of District 50.' In other words, District 50 is an arm or branch of the United Mine Workers of America.

\* \* \* \* \* \*

"Thus, while the defendants' brief insists that 'members of District 50, UCW and UMWA are not members of one organization,' a fair deduction from the record is that District 50 is a component part of United Mine Workers of America, *or at least its agent* in organizing workers in businesses other than that of mining coal." (Italics supplied.)

Section 301(b) of the Labor Management Relations Act, 29 U.S.C.A. § 185 (b) expressly provides:

"(b) Any labor organization which represents employees in an industry affecting commerce as defined in this chapter and any employer whose activities affect com-

merce as defined in this chapter shall be bound by the acts of its agents. * * * "

Defendants argue that they are exempted from liability by the rule laid down in the Coronado cases [1] as adopted in section 6 of the Norris-La Guardia Act,[2] which was interpreted by the Supreme Court in United Brotherhood of Carpenters and Joiners v. United States, 330 U.S. 395, 403, 67 S.Ct. 775, 780, 91 L.Ed. 973 as follows:

"We need not determine whether § 6 should be called a rule of evidence or one that changes the substantive law of agency. We hold that its purpose and effect was to relieve organizations, whether of labor or capital, and members of those organizations from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officers or members of the organization without clear proof that the organization or member, charged with responsibility for the offense, actually participated, gave prior authorization, or ratified such acts after actual knowledge of their perpetration."

It is clear, however, that the rule as so interpreted was not adopted by the Labor Management Relations Act and that its application to suits under that act was expressly excluded by section 301(e), 61 Stat. 156, 157, 29 U.S.C.A. § 185(e), which provides:

"For the purposes of this section, in determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."

The section of the Act under which this action is brought, 303(b), 29 U.S. C.A. § 187(b), expressly provides that suits thereunder shall be subject to the limitations and provisions of section 301, 29 U.S.C.A. § 185, as will be seen by reference to the section which is quoted in full above.

The history of the Act shows clearly that the intent of Congress was to apply to suits of this character the common law rules with respect to liability for acts of an agent. In the Conference Report on the bill which was later enacted into law, the following statement was made:

"Section 303 of the Senate amendment contained a provision the effect of which was to give persons injured by boycotts and jurisdictional disputes described in the new section 8(b) (4) of the National Labor Relations Act a right to sue the labor organization responsible therefor in any district court of the United States (*subject to the limitations and provisions of the section dealing with suits by and against labor organizations*) to recover damages sustained by him together with the costs of the suit. A comparable provision was contained in the House bill in the new section 12 of the National Labor Relations Act dealing with unlawful concerted activities. The conference agreement adopts the provisions of the Senate amendment with clarifying changes." (Italics supplied). Legislative History of Labor Management Relations Act vol. 1, p. 571.

---

1. United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 393–395, 42 S.Ct. 570, 66 L.Ed. 975; Coronado Coal Co. v. United Mine Workers, 268 U.S. 295, 300, 45 S.Ct. 551, 69 L.Ed. 963.

2. Section 6 of the Norris-La Guardia Act, 47 Stat. 70, 71, 29 U.S.C.A. § 106, is as follows:
"No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

In his analysis of the bill Senator Taft had the following to say, 93 Cong.Record p. 7001, Legislative History of Labor Management Relations Act vol. 2, p. 1622:

"Section 2(2), 2(13), and 301(e): The conference agreement in defining the term employer struck out the vague phrase in the Wagner Act 'anyone acting in the interest of an employer' and inserted in lieu thereof the word 'agent'. The term agent is defined in section 2(13) and section 301(e), since it is used throughout the unfair labor practice sections of title I and in sections 301 and 303 of title III. In defining the term the conference amendment reads 'the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.' This restores the law of agency as it has been developed at common law.

"These amendments are criticized in one breath as imposing too harsh a liability upon unions for the acts of their officers or representatives and as too mild with respect to the liability of employers for the acts of their managerial and supervisory personnel. Of course, the definition applies equally in the responsibility imputed to both employers and labor organizations for the acts of their officers or representatives in the scope of their employment.

"It is true that this definition was written to avoid the construction which the Supreme Court in the recent case of United States against United Brotherhood of Carpenters placed upon section 6 of the Norris-La Guardia Act which exempts organizations from liability for illegal acts committed in labor disputes unless proof of actual instigation, participation, or ratification can be shown. The construction the Supreme Court placed on this special exemption was so broad that Mr. Justice Frankfurter, speaking for the dissenting minority, pointed out that all unions need do in the future to escape liability for the illegal actions of their officers is simply to pass a standing resolution disclaiming such responsibility. The conferees agreed that the ordinary law of agency should apply to employer and union representatives. Consequently, when a supervisor acting in his capacity as such, engages in intimidating conduct or illegal action with respect to employees or labor organizers his conduct can be imputed to his employer regardless whether or not the company officials approved or were even aware of his actions. Similarly union business agents or stewards, acting in their capacity of union officers, may make their union guilty of an unfair-labor practice when they engage in conduct made an unfair-labor practice in the bill, even though no formal action has been taken by the union to authorize or approve such conduct."

■ The argument is made that the strikes here are within the exception of 29 U.S.C.A. § 187(a) (2) quoted above, because the purpose of the strikes was to force plaintiffs to recognize and deal with a union with which they had a bargaining contract; but the answer is that the exception applies only where "such labor organization has been certified as the representative of such employees under the provisions of section 9 of the National Labor Relations Act (29 U.S.C.A. § 159)", and there had been no such certification. We know of no principle of law under which we would be justified in enlarging the exception contained in the statute and we are cited to no authority which would justify such action on our part.

■ Another argument is that no damage has been shown because it is said that the three year lease had not been delivered and future profits of the business which plaintiffs were forced to abandon were purely speculative. We think, however, that the evidence sufficiently showed that plaintiffs had estab-

lished a profitable business under the arrangement they had with Clinchfield, and that irrespective of the three year lease a sufficient basis had been laid for an award of damages. As said by the Supreme Court in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544, a tort case arising under the Sherman Act:

> "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise."

See also Bigelow v. R. K. O. Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652, and Polar Steamship Corp. v. Inland Overseas Steamship Corp., 4 Cir., 136 F.2d 835.

**2. The question of Punitive Damages.**

■ While we think that there was sufficient evidence to take the case to the jury on the question of actual damages, we think there was error in allowing the jury to award punitive damages. This is not a case brought under the diversity jurisdiction of the federal courts to enforce a common law liability, where we are governed by state decisions and would be bound on the question of punitive damages by the decision of the Supreme Court of Appeals of Virginia in United Construction Workers v. Laburnum Const. Corp. supra, 194 Va. 872, 75 S.E.2d 694. There is no diversity of citizenship and the plaintiffs are entitled to invoke the jurisdiction of the federal courts only because they sue on a cause of action created by a federal statute, i. e., on the cause of action created by section 303(b) of the Labor Management Relations Act, 29 U.S.C.A. § 187(b), heretofore quoted. That section makes no provision for the recovery of punitive damages; but on the contrary provides expressly that the aggrieved party "shall recover *the damages by him sustained* and the cost of the suit". (Italics supplied.) "Punitive damages are damages beyond and above the amount which a plaintiff has really suffered, and they are awarded upon the theory that they are a punishment to the defendant, and not a mere matter of compensation for injuries sustained by plaintiff." Washington Gas Light Co. v. Lansden, 172 U.S. 534, 553, 19 S.Ct. 296, 303, 43 L.Ed. 543; 15 Am.Jur. p. 700.

Where Congress has intended that damages in excess of the actual damage sustained by plaintiff may be recovered in an action created by statute, it has found no difficulty in using language appropriate to that end. Thus, in copyright cases, 17 U.S.C.A. § 1, in patent cases, 35 U.S.C.A. § 284, and in anti-trust cases, 15 U.S.C.A. § 15, the right to recover treble damages is expressly given. There is nothing in the language of the statute here under consideration, however, or in its history, that indicates that Congress intended that anything more than actual damages be recovered. In the Senate debate on the bill, Senator Taft said (93 Cong.Record 5060, Legislative History of Labor Management Relations Act vol. 2, p. 1371):

> "I think, since the sentiment of the Senate is against the injunctive process, I see no reason why suits of this sort should not be permitted to be filed. After all, it is only to restore to people, who lose something, because of boycotts and jurisdictional strikes, the money which they have lost."

Later in a colloquy with Senator Morse, who was insisting that the effect of the statute would be to inflict unconscionable punishment upon unions engaging in a boycott, and had argued that there was no parallel in other statutes for imposing such liability, Senator Taft said (93 Cong.Record p. 5074, Legislative History of the Labor Management Relations Act vol. 2, p. 1398):

"The Senator asks for a parallel, and I can give him one. Under the Sherman Act the same question of boycott damage is subject to a suit for damages and attorneys' fees. In this case we simply provide for the amount of the actual damages."

In the absence of anything in the act itself or in its history indicating an intention on the part of Congress to authorize the recovery of punitive damages by this highly controversial legislation, the courts would not be justified, we think, in construing it to permit such recovery. In Amazon Cotton Mill Co. v. Textile Workers Union of America, 4 Cir., 167 F.2d 183, 186, which dealt with the same statute, we quoted with approval the language of the Supreme Court in a case involving the Railway Labor Act, 45 U.S.C.A. § 151 et seq., to the effect that, " 'The inference is strong that Congress intended to go no further in its use of the processes of adjudication and litigation than the express provisions of the Act indicate'." We are still of that opinion. In the light of the history of recent labor legislation, it is hardly conceivable that Congress could have intended to vest in the courts the power to punish unions by awards of punitive damages. Certainly, in the struggle over this act, which was vetoed by the President and passed by the Congress over his veto, no one ever suggested, so far as we are advised, that punitive damages could be awarded under its provisions.

3. The Evidentiary Questions.

■ Over the objection of defendants, plaintiffs were allowed to show that at the time of the effort to unionize the non-union truck mines in early 1950 an attempt was made to dynamite plaintiffs' tipple and that the tipple of the mine of Willard Dotson, who was attempting to operate non-union was dynamited. We think that the admission of this testimony was clearly erroneous and highly prejudicial. It was not shown by circumstantial evidence or otherwise that the defendants or, for that matter, any union member, had any connection whatever with either the dynamiting or the attempted dynamiting. Neither of the incidents had any tendency to connect the defendants with the strikes of which plaintiffs complained or to establish the damages sustained by plaintiffs as a result of the strikes. On the other hand, the testimony was highly prejudicial to plaintiffs, as its admission necessarily created in the minds of the jurors the impression that the dynamitings were in some way connected with the case. It is said that the evidence was admissible as establishing the background of the situation. We think, however, that its effect was necessarily to establish a background of prejudice against defendants and divert the minds of the jury from the real issues involved in the case, and that, in the absence of evidence connecting defendants with the dynamitings, any evidence with regard thereto should have been excluded. 20 Am.Jur. p. 239.

The trial judge admitted in evidence copies of reports made by Clinchfield to the Bureau of Labor Statistics, taken from the files of Clinchfield, showing that strikes in the early part of 1950 were caused by efforts to unionize the truck mines. These reports, the admissibility of which is urged under 28 U.S.C. §§ 1732 and 1733, were not made as a matter of routine in the regular course of the coal business, so as to be admissible as business records under 28 U.S.C. § 1732, but related to controversial matters necessarily resting on conclusion and hearsay and were clearly inadmissible under the principles laid down

in Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645; Gilbert v. Gulf Oil Corp., 4 Cir., 175 F.2d 705; and Franklin v. Skelly Oil Co., 10 Cir., 141 F.2d 568, 572, 153 A.L.R. 156. They were like the accident reports held inadmissible in Palmer v. Hoffman, supra. As said by Judge Learned Hand in United States v. Grayson, 2 Cir., 166 F.2d 863, 869:

> "The statute did not mean to make competent whatever the entrant picked up from random sources, although it was part of his business to pick up information where and when he could and make a record of it. The 'act, transaction, occurrence or event' which the entrant records must be one of which either he has knowledge, or which he learns from a declarant who shall 'in the course of the business transmit the information for inclusion in the memorandum'. 'Multiple hearsay' is no more competent now than single hearsay was before."

The reports, having been made not by defendants but by Clinchfield, were not admissible as declarations against interest. They were not records of account nor minutes of proceedings of a department or agency of the United States and admissible as such under 28 U.S.C. § 1733. While they were copies of papers filed with a department or agency of the United States, they were no more admissible as such than the originals would have been. As the reports related to the very matters at issue in the case, and dealt, not with transactions recorded in the ordinary course of business but with matters depending upon hearsay and conclusions drawn therefrom by the maker of the reports, they should have been excluded and the maker of the reports, if he had any knowledge of the matter, should have been produced as a witness where he could have been subjected to cross examination.

Other exceptions to testimony relate to minor matters which could not have affected the result and consequently do not furnish grounds for reversal; but this testimony as to the reports of Clinchfield which go to the very heart of the controversy between the parties and the highly prejudicial testimony as to the dynamitings, which has nothing to do with the issues involved in the case and necessarily had the effect of inflaming the jury against the defendants, are in a different category. A verdict in favor of plaintiffs in the sum of $225,000 for the destruction of a business in which they had invested only $10,000 in cash about a year before ought not be allowed to stand, when the inference can fairly be drawn that the jury may have been influenced in reaching such result by incompetent and prejudicial evidence of this sort.

**4. Error in the Charge of the Court.**

Defendants requested the court to give the jury the following instruction on the issue of damages:

> "With respect to damages, if the jury believe under the evidence in this case and the instructions of the Court that the plaintiffs are entitled to recover against either or both of the defendants, the jury are told that the burden is on the plaintiffs to prove the amount of their damages with reasonable certainty. Expected profits are not the measure of damages recoverable, but if the particular business alleged to have been disrupted was of sufficiently long standing to be considered as an established business, and the factors entering into coal mining were sufficiently stable in order to justify a reasonable belief that they might so continue, then the jury can consider profits realized before April, 1950, not as the measure of damage, but as bearing on what amount, if any, the plaintiffs are entitled to recover in this case."

The court declined this instruction and, after telling the jury that it was immaterial on the issue of liability

whether the three year lease was executed or not, charged them on the issue of damages as follows:

"If you believe that their mining operation had continued for a sufficient length of time to be considered as an established business, then you may include in your verdict such a sum as you believe would reasonably compensate them for the loss of profits which they would have earned *during the period of the lease* which Clinchfield had promised them. While the amount of profits earned during the period during which plaintiffs did operate is not conclusive, you may consider past earnings as a reasonable basis for calculation of what the future profits would have been, and in any event, your verdict for actual damages should not exceed the sum of $150,000.00, the amount sued for." (Italics supplied.)

We think that there was error in the portion of the charge which we have quoted, in that it adopted the term provided by the lease as the period for the awarding of lost profits. The jury might have found from the evidence that the execution of the three year lease was never concluded between the parties and that, even if there had been no strike, plaintiffs would not have operated the mine to the end of the term which it was intended to provide. It was proper for the jury to consider damages resulting from the destruction of plaintiffs' business and in this connection to consider whether or not they were prevented from obtaining the three year lease as a result thereof, and the plaintiffs were entitled to an instruction to that effect; but the jury should not have been instructed to assess damages just as though it were established as a fact that the three year lease had been obtained.

For the reasons stated, the judgment appealed from will be reversed and the case will be remanded for a new trial or for further proceedings not inconsistent herewith.

Reversed.