**ROADWAY EXPRESS, INC.**

v.

**HIGHWAY TRUCK DRIVERS AND HELPERS, LOCAL NO. 107.**

Civ. A. No. 38356.

United States District Court
E. D. Pennsylvania.

May 9, 1969.

Herman Lazarus, Lazarus & Levin, Philadelphia, Pa., for plaintiff.

F. Emmett Fitzpatrick, Jr., Fitzpatrick & Smith, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

WOOD, District Judge.

This is a motion for a new trial or judgment notwithstanding the verdict. Suit was initially commenced by Roadway under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, against the defendant union for damages in connection with an alleged breach of a collective bargaining agreement then in effect between them. Roadway contended that the union had violated the "no strike" provisions of the agreement when it caused a prolonged work stoppage at Roadway's shipping terminals in Philadelphia and Wilmington following a seemingly minor altercation over working conditions rather than resolving the matter through the grievance procedure without a work stoppage as it was obliged to do under the agreement. After trial from December 12–19, 1968, a jury found in favor of Roadway and awarded it a recovery of $980,000 for damages incurred while the union was on strike.

 We will consider the grounds raised by the defendant in resisting the verdict in the order that they appear in the brief in support of his motion. The defendant first contends that, pursuant to 43 P.S. § 206h[1] as well as Article 4 and Article 43, Section 7(a) of the collective bargaining agreement, the union could not be held accountable in a civil action for the acts of its individual members unless it was shown that the union itself or its officers participated in, sanctioned, or ratified such acts. It is asserted that we should have submitted to the jury the question of whether the union's officers or business agents[2] actually approved of the work stoppages from which Roadway's damages flowed.

This request comes rather late. The issue of authorization by the union or its officers was not raised in the written points for charge submitted to us by the defendant.[3] Nor did he, after our charge and before the jury retired, specifically state any desire to have the issue of authorization submitted to the jury, as is required by Rule 51.[4]

In any event, as can be demonstrated from a review of uncontradicted evidence, it would be beyond our credulity to suppose that the officers and the union did not sanction the strike here complained of. The mass work stoppage developed from a series of incidents at the Roadway plant on the afternoon and early evening of June 11, 1965. A Roadway employee who was also a member of the union refused to load a truck in the manner in which the company instructed him to. After giving the employee a

---

1. It may well be that the question of authorization by union officers or by the union itself would be determined by the perhaps lesser standards provided in 29 U.S.C. § 185(e). For reasons to be stated, however, we would conclude under either standard that the strike was authorized.

2. The officials of the union designated to represent it in discussions of grievances with the company.

3. The defendant did at the close of the presentation of evidence move for a directed verdict on the ground that "the plaintiff [had] failed to carry its burden to show that this strike was in any way authorized by the defendant labor organization." (N.T. 396) We denied this motion because we thought that there was

clear and substantial evidence that the union as well as its officers had authorized the strike.

4. There was an objection to "that portion of (our) charge in which (we) stated that as a matter of law it seems that the contract was violated." (N.T. 462) During the course of our charge we did state that we thought that the contract was violated as a matter of law because the union had clearly refused to pursue the grievance procedure. However, this general objection would not meet the requirement of Rule 51 that objections be stated specifically. See Barron & Holtzoff, Federal Practice and Procedure § 1103.

warning, a company representative served the employee with an Intent to Discharge which, under the bargaining agreement, was to take effect in twenty-four hours unless the other party resorted to the grievance procedure. During the remainder of the afternoon and into the evening, union business agents and company representatives met to discuss the dispute. There was testimony that union officials arrived at this meeting saying they had authorization to strike and that employees had been ordered not to perform the loading operation in question until the matter was resolved to the union's satisfaction. No grievance papers were filed protesting the imminent discharge for failure to load the truck.[5] Sometime in the course of that evening, all the members of the union employed at the Roadway Philadelphia terminal left their work and did not thereafter return. Late that evening or early the next morning, Roadway sent telegrams to Local 107, to the Teamsters Eastern Conference, and to the National Headquarters of the Teamsters, inquiring whether the foregoing events constituted a strike sanctioned by the union, and requesting compliance with the terms of the collective bargaining agreement. There is no evidence that the union ever responded to these inquiries, or commanded its members to return to work or desist in their obstruction of activity at the gate of the terminal. The work stoppage continued through the succeeding weeks, and there was uncontradicted testimony that a considerable number of Local 107 members, including business agents of the union, congregated outside the gate of the terminal and effectively prevented use of the terminal by the company. When the company attempted to move some of its equipment to another location, a group of Local 107 members which also included business agents harassed the company entourage and compelled its return to the terminal. When company officials attempted to leave the terminal for a meeting with the state court concerning the strike, a large number of Local 107 members and officers located outside the gate of the terminal obstructed passage of the company's car. The strike continued without any demonstrable attempt on the part of the union or its officers to have Roadway employees return to work.

If the foregoing circumstances do not demonstrate union sanction of the strike, the failure of the union or its officers to command its men to return to work or to desist from their obstruction of activity at the Roadway terminal, the closing of the Wilmington terminal, and the enlargement of the work stoppage to a city-wide strike in support of the walkout at Roadway, certainly constituted a ratification of earlier acts by members of the union. Furthermore, on June 20, the membership of Local 107 met in a meeting chaired by its President at the Hotel Philadelphia. According to the official minutes of this meeting, the Secretary-Treasurer moved that members of Local 107 "take a holiday

---

5. As would have been required under the collective bargaining agreement had the union desired to contest the discharge. Article 43 Section 1 of the agreement provided that "The Union and the Employers agree that there shall be no strike, lockout, tie-up or legal proceedings without first using all possible means of a settlement as provided for in this Agreement, of any controversy which might arise." It is further provided that if there is a dispute involving working conditions or work to be done the employee may receive a warning. If the employee's conduct remains unsatisfactory, the employee may be served with a notice of Intent to Discharge, which is not to take effect for twenty-four hours. During this twenty-four-hour period, representatives of the union and the company may meet to discuss an amicable resolution of the problem. If no such resolution is reached, and if the aggrieved party wishes to further contest in the matter, it has 10 days in which to submit the case to grievance and arbitration procedure. In the instant case, discussions were held within the twenty-four-hour period but the case was not submitted to the grievance and arbitration procedures provided in the agreement.

until such time as the Roadway strike is settled." The minutes expressly stated that all officers and agents of the union were present at this meeting with the exception of one business agent.

In view of the overwhelming evidence of participation, authorization and ratification of the strike by the union organization, its officers, and the mass of Local 107 members, we must conclude that even if the authorization issue had been submitted to the jury, they could not have returned with any other conclusion than that the strike was fully authorized.

■ The defendant's second objection is that the admission of testimony concerning violence and other acts directed against Roadway's property and supervisory personnel was immaterial, irrelevant, and highly prejudicial. It is contended that evidence relating to such acts would only be relevant if it could be shown that they were condoned or approved of by the union through its officers or business agents. United Mine Workers of America v. Patton, 211 F.2d 742 (4th Cir.1954) is cited for the proposition that "evidence of an attempted dynamiting was held to be improperly admitted and prejudicial where there was no evidence to connect the union with the attempt."

We think that this objection lacks merit even under this authority cited to us because in each case there was either circumstantial evidence or direct testimony to identify and implicate both union officers and the mass of union members with the acts in question. We considered the testimony which showed that members of Local 107 congregated outside the gates of the Roadway terminal and, frequently by violent means, obstructed Roadway equipment from entering or leaving the site was very relevant in demonstrating the nature of the work stoppage and the course of the strike. There was testimony identifying both large numbers of Local 107 members and officers of the union present outside the gates of the terminal. Moreover,

the continuation of such acts of harassment with the knowledge of union officers, and after repeated protests to the union by the company, suggests a strong inference that they were sanctioned by the union. Therefore, the *Patton* case is not relevant because there " * * * It was not shown by circumstantial evidence or otherwise that the defendants or, for that matter, any union member, had any connection whatever with either the dynamiting or the attempted dynamiting. Neither of the incidents (in *Patton*) had any tendency to connect the defendants with the strikes of which plaintiffs complained or to establish the damages sustained by plaintiffs as a result of the strikes." 211 F.2d 742, 750.

■ The defendant's third objection is that "no damages should have been awarded because the work stoppage was provoked by the company's own conduct." In this connection, he now for the first time invokes the doctrine of Mastro Plastics Corp. v. N.L.R.B., 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956) that under certain circumstances, as a matter of construction of a specific collective bargaining agreement it may be concluded that a "no strike" clause in that agreement was not intended to preclude strikes provoked by the employer's unfair labor practices protected by Sections 7 and 8(a) of the National Labor Relations Act. The defendant contends that the issue of provocation or unfair labor practices by the employer should have been submitted to the jury.

This seems to us to be an afterthought. The first three points of the defendant's written points for charge stated generally the principle of the law of contracts that a repudiation of a contract by one party may excuse performance by the other party. No authority was cited and there was no mention of *Mastro* or unfair labor practices on the part of the employer Roadway. We stated to the defendant prior to his argument to the jury that the aforementioned three points were disapproved "not on the law but in the manner in

which (they were) written." Following arguments and our charge, there was no specific objection to our failure to charge on excuse of performance due to provocation, repudiation or unfair labor practices, as required by Rule 51.

In any event, there was no attempt on the part of the defendant to bring the *Mastro* doctrine into the case during the trial. We do not consider *Mastro* relevant here anyway because there was no showing that Roadway was attempting to destroy the union or the collective bargaining rights of its employees protected by Sections 7 and 8(a), and because in any case it could not be said that the strike was directed *solely* against any alleged unfair labor practices of the employer.[6]

■ The defendant's fourth objection is that "the issue of mitigation of damages was never submitted to the jury, despite (his) request for points for

charge on this question. The jury should also have been asked to consider whether the management decision to keep the terminal open until November, 1965 was a reasonable one in light of the duty to mitigate damages." (Defendant's brief, p. 9)

The defendant did not press the issue of mitigation of damages during trial. He did include in his points for charge two general statements to the effect that a party cannot recover damages flowing from consequences which that party could have avoided with reasonable efforts. We indicated to counsel before argument to the jury (N.T. 406) that we could not give such a charge because there was no evidence tending to show what the plaintiff might reasonably have done to mitigate damages. The defendant did not at that time cite any evidence to support such a charge, nor did he in any other manner object. Cer-

6. In *Mastro* there was a contest between three unions to determine which should be the employer's bargaining representative. During the campaign, the established representative served notice of a desire to reopen or modify the existing collective bargaining agreement pursuant to the procedure prescribed by 29 U.S.C. § 158(d). The employer actually supported one of the unions, and after negotiations had begun it precipitated a strike by discharging an employee for campaigning on behalf of the established union. The strikers later petitioned the National Labor Relations Board for reinstatement, and the company defended on the grounds that the union had violated the "no strike" clause in their collective bargaining agreement as well as Section 8(d) of the National Labor Relations Act.

Both the Labor Board and the appellate courts found that the company's acts of interference with the employee's selection of their collective bargaining unit were a "flagrant example of interference by the employers with the expressly protected right of their employees to select their own bargaining representative." 350 U.S. 270, 278, 76 S.Ct. 349, 355. The Supreme Court, in affirming the Board's reinstatement order, held first that as a matter of construction of the collective bargaining agreement between the parties, the union's undertaking "to refrain from engaging in any strike or work stoppage during term of agreement" did not waive

the employee's right to strike solely in protest against unfair labor practices of their employers in violation of Section 8(a); and second that Section 8(d) of the Act did not deprive the individual strikers of their status as employees. The court stressed that "provided the selection of the bargaining representative remains free", waivers of the employee's right to strike contribute to the normal flow of commerce and to the maintenance of regular production schedules.

Aside from the fact that the issue was never raised, the *Mastro* case is clearly inapplicable to the case before us. We are not aware of any protest by the union to the Labor Board or anyone else that the company's activities constituted a violation of the rights granted the employees in Sections 7 and 8(a). To the contrary, the strike here was precipitated by the union's attempt to coerce the company to reinstate employees by the threat of a work stoppage, rather than to vindicate any rights they might have had through the grievance procedure they had contracted to observe. We cannot discern any evidence of an attempt to interfere with the employees' rights under Sections 7 and 8(a); moreover the union strike was directed against a condition of their work environment, and therefore they were not as the employees were held to be in *Mastro*, striking *solely* against unfair labor practices of their employer.

tainly there was no mention of management's decision to keep the terminal open until November, 1965. We did charge the jury generally on the subject of damages, and stated that the testimony of the plaintiff's witness was uncontradicted except insofar as there was cross-examination by the defendant. We further stated that the plaintiff was entitled to damages "reasonably incurred as a result of a strike or work stoppage." (N.T. 458) Following our charge, we permitted the defendant to make a number of objections to our charge. (N.T. 460–4), and he failed to make any mention of, or exception to, our charge on damages. The hour is rather late to now raise the mitigation issue.

■ In any event, it would not have been proper for us to charge specifically on the issue of mitigation because there was no evidence to support such a charge. The party who commits a wrong has the burden of establishing matters asserted by him in mitigation or reduction of damages. See Watsontown Brick Co. v. Hercules Powder Co., 265 F.Supp. 268, 275 (M.D. Pa.1967), affd. 3 Cir., 387 F.2d 99; 11 Pennsylvania Law Encyclopedia, Damages §§ 22, 131. The only testimony concerning damages was that presented by the plaintiff's witness, the comptroller of Roadway. The defense did cross-examine this witness extensively concerning the items of damages he presented, but it did not adduce any evidence at all to show how the plaintiff might have reduced damages, or what the cost of any such mitigation would have been. Given this state of the evidence, we could not have gone further then we did in saying that the plaintiff was only entitled to damages "reasonably incurred as a result of the strike or work stoppage." Because there was no evidence as to the cost or feasibility of any alternative course which might have been open to Roadway management to mitigate damages, for us to have gone further and charged on mitigation would have been improper since the jury could only have assessed the possibility of such an alternative course by speculation or conjecture.

■ The defendant's final objection is that the damages awarded by the jury were excessive and speculative. It is difficult to ascertain whether his objection is to the admission of testimony, to our charge, or to the verdict.[7] Regardless of how the objection is couched, it must be rejected because the verdict was not excessive, nor do we think that it was based upon "conjecture; uncertain estimates, or mere conclusions."[8] We have reviewed the evidence presented by

---

7. There was no objection or other indication of dissatisfaction expressed at trial with the nature of the evidence that had been presented, nor was there an objection at the close of the evidence that the evidence did not provide a proper basis for the jury to ascertain damages. Defendant's points for charge did contain one point stating generally that plaintiff was only entitled to damages or loss of profits reasonably incurred. We gave a charge which covered the substance of this request, and there was no objection entered before the jury retired, as required by Rule 51.

8. The defendant has cited to us in this regard several passages from Pennsylvania Law Encyclopedia, Volume 11, Damages, §§ 137–138. Although for the reasons stated we consider the evidence presented by the plaintiff within the requisite bounds of certainty, we note the following passage from the same volume, Damages § 2 which states that as a general principle, damages should be calculable with reasonable certainty, but:

"On the other hand, damages are generally involved in some uncertainty and contingency, and, as a result, the law, in allowing damages, requires only reasonable certainty as distinguished from mere conjecture. In this connection, damages are not conjectural or speculative merely because they are incapable of calculation with mathematical exactness, and it has been held that the law does not require that proof in support of claims for damages or in support of claims for compensation conform to a standard of mathematical exactness, and that evidence in support thereof is sufficient if it affords a reasonably fair basis of calculating the loss.

"Courts will not be astute to permit persons who admit they have com-

the plaintiff on damages and we consider it sufficient to afford a reasonable basis for the jury to ascertain damages under the circumstances. Mr. Crawford, Roadway's comptroller, testified fully (N.T. 189–247) regarding the accounting method by which he computed damages, most of which were expenses actually incurred by Roadway to maintain its equipment and terminals. The system by which Mr. Crawford allocated these expenses between Roadway's Philadelphia terminal and its other terminals was fully explained and it was the jury's province to determine which items were reasonable and which were not. Although the resulting verdict was relatively large in amount, we thought that it was entirely fair and reasonable under the circumstances.[9]

Because of the magnitude of the verdict we will consider individually the contentions of the defendant regarding the assessment of damages. The first contention is that:

"An examination of the method used in computing lost profits shows that the figures for item of loss are entirely speculative. The company establishes a revenue quota (an estimate). Gross revenue is obtained by applying a percentage of 95% to the revenue quota (The percentage applied is an estimate). From the gross revenue for the Phila.-Wilmington terminals, there is deducted the increased revenues at surrounding terminals. To this figure a profit ratio (an estimate based on entire volume of business) is applied. N.T. 235 to 237. It is obvious that estimates are used at each stage of the computation.

"The figures for lost profits are entirely conjectural because plaintiff had no way of knowing whether Phila.-Wilmington would achieve their budgeted profits for the remainder of 1965." (Defendant's brief, page 10).

We think that the method employed for computing lost profits was very reasonable under the circumstances, and under the authority referred to by the defendant himself. See 11 Pennsylvania Law Encyclopedia, Damages, §§ 137–138.

mitted a wrong to escape the consequences of their acts because of a lack of precise means of proving the commission of the wrong, especially where the nature of the case does not permit exact proof, and where there is a basis in the evidence for a reasonable computation of the damage suffered, considering the nature of the transaction, a verdict may be based thereon, even though there may be some uncertainty as to the amount of damage. As otherwise stated, compensation cannot be refused because proof of the exact amount of the loss or injury is not produced, for there is judicial recognition of the difficulty or even the impossibility of the production of such proof, and all that the law requires in such cases is that the evidence shall, with a fair degree of probability, establish a basis for the assessment of damages."

9. The plaintiff asserted damages in four areas in which the company was allegedly compelled to incur expenses which were not covered by revenues attributable to operations involving the Philadelphia and Wilmington terminals because of the closing of those terminals: (1) direct expenses (i. e. at the Philadelphia and Wilmington terminals—rent, taxes, supervisory payroll, rerouting of freight) ; (2) expenses incurred at other Roadway terminals which were not compensated for by anticipated revenues which would have been received had the Philadelphia and Wilmington terminals not been closed; (3) "Line haul costs", the costs of purchasing and maintaining the equipment used in shipping the goods; and (4) the overhead of the Roadway main office allocated to the Philadelphia and Wilmington terminals. The plaintiffs asserted that their expenses in these categories due to the closing of the two terminals between June 11 and September 11, 1965, was approximately $834,000. Plaintiff asserted that their loss of profits between June 11 (the beginning of the strike) and September 11 (the closing of the terminals) was approximately $197,000. They further asserted that there were additional expenses, such as rent and taxes, for the Philadelphia and Wilmington terminals incurred in the latter part of 1965 and 1966 amounting to $136,059. The sum of these items claimed was approximately $1,167,059. The jury returned a verdict in favor of the plaintiff for $980,000 in damages.

The procedure used was explained to the jury, and they could accept or reject as many of the plaintiff's figures as seemed reasonable and fair. The objection cited above refers to the lost profits asserted by the plaintiff, which made up approximately $197,000 of the total $1,167,059 claimed by them as losses resulting from the work stoppage. (The remainder of the total was described by the plaintiff's witness as the expense involved in maintaining Roadway terminals and equipment without revenues normally derived from Philadelphia-Wilmington business to pay their cost.) It is rather unseemly for the defendant whom the jury here found responsible for the work stoppage to now assert that plaintiff is precluded from recovering loss because it is not possible to be absolutely sure precisely what the plaintiff's profits would have been had there not been a stoppage. See Story Parchment Co. v. Patterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); International Union of Operating Engineers, Local 653 v. Bay City Erection Co., 300 F.2d 270 (5th Cir. 1962). The estimate was not at all blindly conjectural as asserted by the defendant. There was uncontradicted testimony in the record that it had been the company's past experience that it actually obtained 95 to 97 percent of its projected revenue quota, and that in previous years they had never failed to obtain less than 93 percent of its revenue quota (N.T. 235–9). Similarly, the plaintiff's witness testified to the method by which the profit ratio was calculated and the past experience upon which the method was founded. We instructed the jury that they should examine the testimony of the plaintiff's witness carefully and award only such damages as were "reasonably incurred as a result of the work stoppage", and we cannot say that they discharged their duty in arriving at their verdict in an unreasonable manner.

The second contention urged in the defendant's brief is that:

"* * * plaintiff had no way of knowing how much of the business of the Phila.-Wilmington terminals would be diverted to other terminals in the vicinity. Plaintiff admitted that adjacent terminals experienced an increase in business. Plaintiff reduced the anticipated lost revenues from Phila.-Wilmington by the amount of the increase at nearby terminals. Nevertheless, this allocation presupposes that these adjacent terminals were able to achieve their budgeted profit from their own operation and that only the excess was attributable to business diverted from Phila.-Wilmington. In fact, these terminals could have experienced a sharp decline in revenues attributable to their own operations. Such a decline could have been made up by business diverted from the Phila.-Wilmington area." (Defendant's brief, page 10)

Again we do not think that the defendant who caused the work stoppages should be able to make such speculations. There is no evidence that the revenue attributable to other terminals would fluctuate greatly, and there is no reason in the testimony to suggest that such revenue would fluctuate in such an irregular manner. To the contrary, Roadway's comptroller testified that as part of his duties he developed estimates for gross revenue for every Roadway terminal, that such estimates were always reasonably close, and that according to his experience the actual gross revenue for any terminal operation would be at least 90 percent of the estimated gross revenue for that terminal (N.T. 213). It would be unreasonable to require, as this objection of the defendant seemingly implies, that to establish a reasonable basis for his damages in this case, the plaintiff must go further and somehow show why or how terminals in the proximity of Philadelphia and Wilmington achieved their budgeted profit from their operation and that in fact they did not experience a sharp decline in revenues attributable to their

own operations. In any event, the jury heard testimony concerning the deduction from asserted lost revenues from Philadelphia-Wilmington to take account for the increase in revenues in neighboring terminals (presumably attributable to Roadway customers who employed neighboring Roadway terminals following the Philadelphia-Wilmington shutdown), and they could make whatever discount from the anticipated lost revenues from Philadelphia-Wilmington as they thought reasonable and appropriate under the circumstances.

The third argument advanced by the defendant in support of his contention that the verdict was excessive or not supported by a reasonable basis is that:

"In his computation of expenses, plaintiff made an allocation of costs at the various other terminals to Philadelphia. (Destination costs). The theory behind this allocation is the accounting principle that expenses incurred should be matched against the revenue to which it is attributable. Thus in a shipment from Philadelphia to St. Louis a part of the expenses of the St. Louis terminal are attributable to that shipment and should be matched against the revenue therefrom (N.T. 190) Since no shipments were being made from Philadelphia, no destination costs should be allocated to Philadelphia. * * *" (Defendant's brief, page 11).

This contention was at variance with the testimony of Roadway's comptroller. The claim of the plaintiff, as stated on a number of occasions (see e. g. N.T. 243) was that because there were no shipments originating in Philadelphia or Wilmington due to the work stoppage, Roadway was deprived of revenues from such shipments which would have covered the costs allocated to those destination terminals in doing their part in receiving and delivering shipments originating in Philadelphia. Because of the work stoppage, a certain amount of the equipment at destination terminals was left idle, and the plaintiff claimed as damages the cost (which would normally have been reimbursed by revenues from shipments originating in Philadelphia) of having such equipment lay idle. The merit of such contentions was of course a question for the jury to resolve, but we cannot say that there was no basis in evidence for their conclusion, or that their conclusion was unreasonable.

Finally, the defendant has objected to evidence regarding "line haul costs", which Roadway's comptroller explained as the costs associated with moving shipments from one terminal to another, as distinguished from the expenses associated with operation of the terminals of origin or destination. Thus line haul costs are the costs of "operating tractors and trailers, depreciation, licenses, fuel, (etc.) * * *" (N.T. 198–9) Defendant apparently now contends that the plaintiff claimed as damages the difference between the legal limit of size of loads on its tractors and the size of loads carried during the work stoppage, rather than the difference between the normal load size and the load size during the strike. It was our understanding that plaintiff was claiming the latter measure of damages (Cf. N.T. 198–9, 207), but again we instructed the jury to grant only those damages "reasonably incurred as a result of the work stoppage," and the validity of the plaintiff's assertion was for it to determine.

In conclusion, after reviewing both the specific objections of the defendant on the questions of damages, as well as the entire testimony concerning damages, we find that the amount of damages awarded was not excessive under the circumstances, and that there was a reasonable basis in the evidence for the jury's conclusion.

## ORDER

And now, this 9th day of May, 1969, it is ordered that the defendant's motions for a new trial or for judgment notwithstanding the verdict are denied.