**UNITED SHOE WORKERS OF AMER-ICA, AFL-CIO, et al.,**

v.

**BROOKS SHOE MANUFACTURING COMPANY et al.**

**Civ. A. No. 24049.**

United States District Court
E. D. Pennsylvania.

May 2, 1960.

John Silard, Washington, D. C., Saul C. Waldbaum, Philadelphia, Pa., for plaintiffs.

Thomas F. Devine, Robert K. Greenfield, Philadelphia, Pa., for defendants.

WOOD, District Judge.

This is a suit by Local 127 of the United Shoe Workers of America, AFL-CIO, against the Brooks Shoe Manufacturing Company, the Brooks Shoe Manufacturing Company, Inc., and Michael Goldenberg, for breach of a collective bargaining agreement. The case was tried without a jury on the question of liability alone. It was understood by the Court and counsel that questions of remedies and whether certain individual plaintiffs are proper parties to the suit would be reserved until after the Court's determination of whether the collective bargaining agreement had been breached.

The issues in the case involve two separate provisions in the collective bargaining agreement, the interpretation of these provisions, and the question of whether the generally agreed facts prove a breach of these provisions. The provisions in question are contained in a collective bargaining agreement entered into by the plaintiff union and the Brooks Shoe Manufacturing Company in the spring of 1957, which agreement was operative by its terms until December 1, 1957. Those provisions read as follows:

"14. It is recognized that it is necessary for the firm to buy or have made for itself, on the outside, certain types of shoes. It is agreed that no contract work shall be given out and no contract work shall be performed in the shop or factory on shoes known as better grade work. It is understood that by 'contract work' is meant shoes made partially within the plant and completed on the outside, or shoes made partially on the outside and completed within the plant. It is agreed that the firm will continue to make the better grade shoes in their present plant.

"21. It is agreed by the Employer that the shop or factory shall not be *removed* from the County of Philadelphia during the life of this agreement." [Emphasis supplied.]

The Court has jurisdiction over the parties and over the subject matter of the suit by virtue of § 301 of the Labor Management Relations Act, 1947, 29 U.S.C.A. § 185, as amended by Public Law 86-257 of 1959, 29 U.S.C.A. § 401 et seq.

Findings of Fact

1. The defendant, the Brooks Shoe Manufacturing Company, operated an athletic shoe manufacturing and sales business in Philadelphia from 1920 to 1957. From 1950 to April 30, 1957, the business was conducted as a partnership. The partners were John and Michael Goldenberg.

2. In 1938, the Goldenbergs incorporated the Carmen Shoe Manufacturing Company located at Hanover, Pennsylvania. The Carmen Company also manufactures and sells athletic shoes.

3. For several years prior to 1957, and including 1957, plaintiff union represented the employees of the Philadelphia manufacturing operation, the Brooks Shoe Manufacturing Company. During those years the collective bargaining agreement remained substantially the same and included paragraphs containing the same language as paragraphs 14 and 21 of the 1957 agreement.

4. Since its inception, the Carmen Shoe Manufacturing Company's employees have not been represented by any union.

5. The control of the Carmen Company has been in the Goldenberg family during all times material to this suit.

6. Until the early part of 1957, the Goldenbergs' shoe business was operated as follows: In Philadelphia, better grade leather was purchased by the partnership. The "cutters" in the Philadelphia shop placed patterns of various parts of a shoe on the leather and cut out corresponding parts. The "fitters" stitched these parts together. Finally, the shoemakers completed the shoe.

The Carmen Company conducted the same shoemaking operations at the Hanover shop. The leather purchased by the Carmen Company was, however, lower grade leather.

The shoes completed in the Philadelphia shop were handled by the sales department of the Brooks Shoe Manufacturing Company. The sales department was at the same address as the shoemaking shop. The Philadelphia sales department also sold shoes manufactured at Hanover, which the Brooks Shoe Manufacturing Company purchased from the Carmen Company. Shoes made by the Carmen Company sold in Philadelphia were often sold under the Brooks label.

The Brooks Shoe Manufacturing Company sold in Philadelphia a complete line of athletic shoes, at various prices, ranging from lower grade to better grade shoes.

7. In April of 1954, the partnership agreement covering the operation of the Brooks Shoe Manufacturing Company was re-executed. It contained the following provision:

"As soon as possible after May 1, 1954, Brooks shall restrict its manufacturing activities, but shall continue ownership of the capital stock of Carmen."

8. Thereafter, and particularly in 1955 and 1956, cuttings and fittings from the Hanover shop were brought to the Philadelphia shop to be made up into shoes. The amount of cutting and fitting formerly done in the Philadelphia shop was gradually decreased. Finally on March 3, 1956, the cutting and fitting operations in Philadelphia were completely terminated. The result was, of course, that the employees who had performed the cutting and fitting in the Philadelphia shop were laid off.

9. During the same period while the manufacturing operations at the Philadelphia shop were being curtailed, and the employees were being laid off, the operations at the Hanover shop expanded. Starting with the year 1954 through 1957, the number of factory workers in Philadelphia decreased from 43 to 0. The gross sales in Philadelphia decreased from $863,000 to $355,000, while the gross sales at Hanover increased from $767,000 to $1,110,000.

10. The remaining employees in the Philadelphia shop continued to make shoes from the cuttings and fittings sent from the Hanover shop until March 21, 1957, when the manufacturing of shoes in the Philadelphia shop ceased altogether.

11. On September 10, 1956, John Goldenberg notified Michael Goldenberg that he would not renew the partnership agreement, and that agreement expired on April 30, 1957, thus terminating the existence of Brooks Shoe Manufacturing Company. During this interval, Michael Goldenberg had discussed his intentions of expanding the Carmen Shoe Manufacturing Company's operations with John Goldenberg's son, Barton. Michael and Barton Goldenberg decided that upon the dissolution of the partnership, they would concentrate their efforts on building up the Carmen Company. Pursuant to these discussions, at the distribution of the partnership assets, Michael Goldenberg acquired one-half the stock of the Carmen Company and Barton Goldenberg acquired the other half. (The partnership owned all of the stock of the Carmen Company at this time.)

12. Barton Goldenberg owned one-half the stock in the Carmen Company for one year, until April, 1958, when Michael Goldenberg purchased Barton's stock. Since then Michael Goldenberg has been the sole owner of the Carmen Company.

13. After the termination of the partnership, Michael Goldenberg (with his nephew Barton for a year and thereafter by himself) has carried on his shoe business as follows: The name "Carmen Shoe Manufacturing Company" was changed to "Brooks Shoe Manufacturing Company, Inc." The entire shoemaking operation is performed at the Hanover shop. The shoes made are sold under the same "Brooks" label. The line of athletic shoes sold is the same. The prices of shoes sold still range from lower grade to better grade shoes. The customers are the same. The old sales outlet once operated by the partnership

is now operated by the new corporation at the same address in Philadelphia and by the same sales personnel.

It is not clear whether any of the shoes made at the Hanover shop contain better grade leather. On the one hand, Michael Goldenberg testified that *"all* of the shoes that were sold here [Philadelphia] were made by Carmen." (NT100) [Emphasis supplied.] Since the prices of the shoes sold by the new corporation *still* range from lower grade to better grade shoes, we may conclude that better grade shoes have been and are now being made at the Hanover shop. On the other hand, Michael Goldenberg also testified that Brooks today does not manufacture everything it sells (NT41). From this statement it is possible to conclude that the better grade shoes sold by the Brooks Shoe Manufacturing Company, Inc., are purchased from other shoe manufacturing companies. However, under the view we take of this case, it is not necessary to resolve this factual question.

14. To summarize, *the assets* of the new corporation, the Brooks Shoe Manufacturing Company, Inc., are substantially the same as the assets of the old partnership, being the shop at Hanover, the sales outlet at Philadelphia, and the use of the name "Brooks."

15. Also, the *manufacturing operation* of the new corporation is substantially the same as the manufacturing operation of the old partnership. The only possible difference may be that the leather now used in the manufacturing operation at Hanover may not be as good a grade leather as was formerly used at the Philadelphia shop.

## Discussion

### I. The Performance of Contract Work in the Philadelphia Shop.

We first consider the question of whether paragraph 14 of the collective bargaining agreement was breached by the partnership, the Brooks Shoe Manufacturing Company. Referring to paragraph 14, it clearly prohibits the performance in the Philadelphia shop of "contract work" on "shoes known as better grade work." There can be no doubt that the shoemaking done in the Philadelphia shop on the cuttings and fittings made at the Hanover shop was the performance of "contract work." The difficult question is whether this contract work was performed on "shoes known as better grade work."

Michael Goldenberg testified that the leather composing the cuttings and fittings made at the Hanover shop and made up into shoes at the Philadelphia shop was *not* better grade leather. However, the workmanship that went into the actual shoemaking done in Philadelphia was better grade labor. The result of importing cuttings and fittings from Hanover and making up shoes in Philadelphia was a kind of hybrid shoe composed of lower grade leather and better grade workmanship. Should these shoes be considered "better grade work" within the meaning of paragraph 14?

It is not possible to determine from the language of paragraph 14 alone whether the parties intended to prohibit this exact operation. It is our view, however, that this operation falls within the prohibited activities of paragraph 14. We think the tenor of the entire paragraph manifests the union's effort to confine to the Philadelphia shop the *entire shoemaking process* involving better grade shoes. Furthermore, Michael Goldenberg himself testified that he regarded these shoes made in Philadelphia from the Hanover cuttings as "better grade shoes." (See NT56, 57, 61.) For these reasons we think it is fair to construe paragraph 14 as prohibiting the activities engaged in by the partnership, the Brooks Shoe Manufacturing Company, when it caused this contract work to be performed in its Philadelphia shop.

### II. The Removal of the Philadelphia Shop to Hanover.

The question presented in general is whether paragraph 21 of the collective bargaining agreement was breached by the termination of the manufacture of shoes in Philadelphia and the expansion

of the shoe manufacturing operation in Hanover. This question is further complicated by the fact that the business entity conducting the Philadelphia manufacturing operation was terminated when that operation ceased, and a new corporation was formed to conduct the Hanover manufacturing operation. This change in business entities has a double significance. It is related to the question of whether the Philadelphia shop was "removed" to Hanover. It is of significance also in determining which business entities and which individuals, if any, are liable for any breach of paragraph 21.

The defendants contend that paragraph 21 can only be interpreted to mean that the *making of better grade shoes* shall not be removed from Philadelphia during the life of the agreement. The defendants' interpretation is based on the fact that the Philadelphia shop had made only better grade shoes from its inception until 1956, or thereabouts, and the Hanover shop had made lower grade shoes during this period. Therefore, argue the defendants, paragraph 21 merely manifests the intent of the parties to prevent the removal of the manufacture of the better grade shoes traditionally made in Philadelphia to Hanover.

Our interpretation of paragraph 21 is broader than this. We note at the outset, that paragraph 21 states only that *the shop* shall not be removed from Philadelphia during the life of the agreement. We interpret paragraph 21 as prohibiting the removal of *substantially the same shoemaking operation* from Philadelphia to another location.

 The basic purpose of the runaway shop provision in the collective bargaining agreement was, of course, to provide job security for the Philadelphia employees. The Labor Management Relations Act has been interpreted as prohibiting the removal by an employer of his business operations from one location to another when that removal has as its purpose interference with union activities (see T. A. Tredway, et al., and

International Ladies Garment Workers Union, 109 NLRB 1045 (1954); Klotz, 13 NLRB 746 (1939); Schieber Millinery Company, 26 NLRB 937 (1940); Tennessee-Carolina Transportation, 108 NLRB 1369 (1954); N. L. R. B. v. Tennessee-Carolina Transp., 6 Cir., 226 F. 2d 743). Thus, it is clear that even without a runaway shop provision in a collective bargaining agreement, an employer may not move his business operation if that move is made for certain "anti-union purposes."

In the case at bar, the runaway shop provision in the collective bargaining agreement places an additional restriction on the employer in that it prohibits his moving his business away from Philadelphia *for any reason*. The question remaining is how nearly identical must the old manufacturing operation and the newly located operation be in order that we may validly conclude that there was a "removal"?

It seems to us that the answer to that question lies in the fact that the men and women who worked in the Philadelphia shop could have, since the move to Hanover, and could now perform in Hanover the same work they did in Philadelphia. Michael Goldenberg himself testified that he *could have* continued operating the Philadelphia shop through the new corporation (NT145–147). There is nothing in the record indicating that a new kind of worker was needed to perform the work done at Hanover. The record indicates that the shoemaking process at Hanover is exactly the same as was the Philadelphia process. That is, athletic shoes are made by cutting patterns from leather, stitching together these cuttings into fittings and making these fittings into shoes. Whether the leather used at Hanover shop is of a lesser grade than that formerly used at the Philadelphia shop could make no difference in the skills required of the workers.

Much has been made of the fact that Michael Goldenberg desired to produce cheaper shoes because there was more of a market for these. We can well un--

derstand why the cheaper labor at Hanover was sought by Mr. Goldenberg. But cheaper labor in this case means non-unionized labor paid at a lower wage scale. As we have noted above, even in the absence of a runaway shop provision in a collective bargaining agreement, an employer may not move his business operation in order to obtain such labor. We think the record here reveals a design on the part of the employer Michael Goldenberg to avoid his duties and responsibilities to his unionized Philadelphia employees by moving his manufacturing operation to the non-unionized shop at Hanover. We find that substantially the same manufacturing operation as was carried on in Philadelphia has been "removed" to Hanover within the meaning of paragraph 21 of the collective bargaining agreement.

### Conclusions of Law

1. The Brooks Shoe Manufacturing Company, partnership, breached paragraph 14 of the collective bargaining agreement and is liable for that breach for the years 1955 and 1956.

2. The Brooks Shoe Manufacturing Company, Inc., is the alter ego of the Brooks Shoe Manufacturing Company. N. L. R. B. v. Auto Ventshade, Inc., 5 Cir., 276 F.2d 303; N. L. R. B. v. Baldwin Locomotive Works, 3 Cir., 128 F.2d 39; Dickey v. N. L. R. B., 6 Cir., 1954, 217 F.2d 652; Southport Petroleum Co. v. N. L. R. B., 1942, 315 U.S. 100, 62 S.Ct. 452, 86 L.Ed. 718, and N. L. R. B. v. Colten, 6 Cir., 1939, 105 F.2d 179.

3. Paragraph 21 of the collective bargaining agreement was breached by the removal of the partnership's shoemaking operation from Philadelphia to Hanover.

4. The Brooks Shoe Manufacturing Company is liable for the breach of paragraph 21 under the theory of successor-liability.

5. The personal liability, if any, of Michael Goldenberg, the right of the individual plaintiffs to recover, and the proper relief to be awarded are reserved for future hearing, argument and decision.