298 F.2d 277
 LOCAL 127, UNITED SHOE WORKERS OF AMERICA, AFL-CIO,
v.
BROOKS SHOE MANUFACTURING COMPANY, Brooks Shoe Manufacturing
Company, Inc., and Michael Goldenberg, Appellants.
 No. 13421.
 United States Court of Appeals Third Circuit.
 Reargued Nov. 14, 1961.
Decided Jan. 2, 1962, Rehearing Denied Jan. 29, 1962.
 
 Kenneth Souser, Philadelphia, Pa. (Robert H. Kleeb, Robert K. Greenfield, Morgan, Lewis & Bockius, Folz, Bard, Kamsler, Goodis & Greenfield, Philadelphia, Pa., on the brief), for appellants.
 John Silard, Washington, D.C. (Joseph L. Rauh, Jr., Washington, D.C., on the brief), for appellee.
 Before BIGGS, Chief Judge, and GOODRICH, McLAUGHLIN, KALODNER, STALEY, HASTIE, GANEY and SMITH, Circuit Judges.
 PER CURIAM.
 
 
 1
 All members of this court are of the opinion that defendants breached the collective bargaining agreement.
 
 
 2
 The court is evenly divided on the district court's award of compensatory damages: Chief Judge Biggs and Judges McLaughlin, Staley, and Ganey are of the opinion that it is correct; Judges Goodrich, Kalodner, Hastie, and Smith are of the opinion that compensatory damages were properly awarded for the period before but not after the expiration date of the collective bargaining agreement.
 
 
 3
 A majority of the court, Chief Judge Biggs and Judges Goodrich, Kalodner, Hastie, and Smith, are of the opinion that the district court erred in awarding punitive damages, while Judges McLaughlin, Staley, and Ganey think that the award should be affirmed.
 
 
 4
 Therefore, that portion of the district court's judgment awarding punitive damages will be reversed and that portion awarding compensatory damages will be affirmed.
 
 
 5
 STALEY, Circuit Judge.
 
 
 6
 This is a case of first impression in which a federal court was called on to fashion a remedy in a a suit brought under 301(a) of the Labor Management Relations Act, 1947, 29 U.S.C.A. 185(a) ('Act'), by Local 127, United Shoe Workers of America, AFL-CIO ('union'), against the Brooks Shoe Manufacturing Company ('company'), Brooks Shoe Manufacturing Company, Inc., and Michael Goldenberg, defendants, for the alleged breach of a contracting out provision and a guarantee against a runaway shop in a collective bargaining agreement.
 
 
 7
 Members of the Goldenberg family founded the company and at all times relevant controlled Carmen Shoe Manufacturing Company ('Carmen'). The company operated a shoe manufacturing plant in Philadelphia, Pennsylvania, as did Carmen in Hanover, Pennsylvania. The union had organized the company's Philadelphia plant in 1937, and thereafter entered into a series of collective bargaining agreements with it. This litigation arose out of the fact that, although the company had agreed to a renewal of the agreement to December 1, 1957, it ceased all operations at the Philadelphia plant on April 30, 1957, causing certain of its employees, who were members of the union, to be discharged.
 
 
 8
 In separate proceedings, the district court on May 2, 1960, found that the company breached the agreement, as alleged by the union, 183 F.Supp. 568 (E.D.Pa.1960), and on September 22, 1960, awarded $28,011 compensatory and $50,000 punitive damages. 187 F.Supp. 509. The company contends that the evidence completely fails to establish any breach of the agreement.
 
 
 9
 Carmen manufactured a 'lower grade' shoe, while the company, due to the availability and use of better grade leather and more highly skilled labor, manufactured the 'better grade' shoes contemplated by paragraph 14 of the agreement, which provided:
 
 
 10
 '* * * No contract work shall be given out and no contract work shall be performed in the shop or factory on shoes known as better grade work. It is understood that by 'contract work' is meant shoes made partially within the plant and completed on the outside, or shoes made partially on the outside and completed within the plant. It is agreed that the firm will continue to make the better grade shoes in their present plant (the Philadelphia plant).'
 
 
 11
 The method of making shoes at both plants was similar. Cutters would place patterns on leather and cut out various parts of a shoe that fitters stitched together, while as a final step, shoemakers completed the shoe. Beginning sometime after April, 1954, and particularly in 1955 and 1956, cuttings and fittings from Hanover were brought to Philadelphia for assembly, while the amount of cutting and fitting taking place in Philadelphia was gradually reduced until March, 1956, when these operations were completely terminated there, causing cutters and fitters to be discharged. The district court, and we believe correctly so, construed paragraph 14 as extending to the entire manufacturing process, and found, with adequate support in the record, that a breach occurred.
 
 
 12
 Paragraph 14 clearly requires that all work incidental to producing a 'better grade' shoe, regardless of why it is so, be confined to the Philadelphia plant. The last sentence expressly provides that the company will make all 'better grade' shoes in Philadelphia. Certainly such important operations as cutting and fitting come within the ambit of paragraph 14. The record established beyond doubt that the shoe finally assembled was a 'better grade' shoe. Defendant Michael Goldenberg testified that there shoes were of a 'better grade' that resulted, as he said, from the 'better grade work' in Philadelphia.
 
 
 13
 The company argues that the union, by negotiating two renewals of the contract after the conduct constituting a breach first occurred, waived the breach of paragraph 14.[1] But the evidence in the record at most shows that the union, at the time of renegotiation, knew that cutters and fitters were being furloughed in Philadelphia and not that work was being brought there from Hanover. It cannot be said that this limited information was enough to give the union contemporaneous information, a prerequisite that must be met before a waiver is effective.
 
 
 14
 The runaway shop guarantee is contained in paragraph 21 of the agreement and reads:
 
 
 15
 'It is agreed by the Employer that the shop or factory shall not be removed from the County of Philadelphia during the life of this agreement.'
 
 
 16
 Defendant contend that paragraph 21 should be construed to mean that only the manufacturing of 'better grade' shoes could not be removed from the Philadelphia plant, and therefore that it was not guilty of a breach since all the shoes manufactured at Hanover were of a lower grade. We cannot agree. Such an interpretation would go against the plain and clear language and would make the job security that the union had hoped to obtain for its members a fiction. The paragraph provides that 'the shop or factory' shall not be removed, contemplating thereby the general productive capacity, rather than the capacity to produce a particular grade of shoe. It was the over-all operation at the Philadelphia plant, and the jobs involved, that were of primary interest to the union and its members. Continuity of employment, as such, was the matter of first importance, with the opportunity to work on better grade shoes a matter of individual and secondary importance. The union could continue in existence and maintain its membership regardless of the quality of shoes that its members produced.
 
 
 17
 The record fully supports the district court's finding that the company violated paragraph 21. It shows the existence of a systematic plan, called a 'scheme' by the district court, to remove the productive capacity of the Philadelphia plant to Hanover. We begin with a written partnership agreement, secretly entered into in 1954, between John and Michael Goldenberg following unsuccessful efforts to unionize Carmen, which provided:
 
 
 18
 'As soon as possible after May 1, 1954, Brooks shall restrict its manufacturing activities, but shall continue the ownership of the capital stock of Carmen.'
 
 
 19
 Between 1954 and 1956, the work force in Philadelphia was reduced from 43 to 15 employees, while Carmen's work force increased from 135 to 181. Annual gross sales also reflected the transfer of work. From a high of $863,000 in 1954, the beginning of the runaway period, the company's gross sales decreased to $238,000 in 1956. Correspondingly, Carmen's sales increased from $767,000 to $1,112,000 in 1956. Finally, in 1957, the name Carmen Shoe Manufacturing Company was changed to Brooks Shoe Manufacturing Company, Inc. Motivation for removal unquestionably existed, for the wages in Hanover were fifteen to twenty per cent lower than the union wage scale that prevailed in Philadelphia.
 
 
 20
 We now consider the remedy fashioned by the district court. As to the award of compensatory damages, the company contends that the district court committed error in making union dues an element of damages and in awarding such damages not only until the date the agreement was to expire, i.e., December 1, 1957, but also for the foreseeable duration of the company's relationship with union which it found to be twenty years. The union contends, in reply, that the district court's findings of fact fully support the award, and that the defendants have failed to distinguish between the duration and existence of contract rights and the rule for the measurement of contract damages. The punitive damages award has taken the brunt of the attack. The defendants assert that such damages are generally reserved to tort actions and are improper in a contract action under 301(a), and that even if permissible, an award here, under the circumstances, constituted an abuse of discretion. The union, relying on Brown v. Coates, 102 U.S.App.D.C. 300, 253 F.2d 36, 67 A.L.R.2d 943 (1958), asserts that not only can punitive damages be awarded under 301(a), but that such an award is proper where the breach is tortious, willful or flagrant, and the award would further what they allege is our national labor policy. In its original complaint the union requested, inter alia, that the defendants be enjoined from operating outside Philadelphia and that they be required to return to Philadelphia all the assets, machinery, and manufacturing facilities of the company. The district court refused to order the company to return to Philadelphia because of the economic hardship that this would entail and found that it would be impractical to have the defendants offer the Philadelphia employees employment at Hanover.
 
 
 21
 The bounds within which a federal court can travel in fashioning a remedy in an action under 301(a) are far apart but well marked since the Supreme Court's decision in Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 456-457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957), where it was said:
 
 
 22
 'The question then is, what is the substantive law to be applied in suits under 301(a)? We conclude that the substantive law to apply in suits under 301(a) is federal law, which the courts must fashion from the policy of our national labor laws. * * * The Labor Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem. * * * Federal interpretation of the federal law will govern, not state law. * * * But state law, if compatible with the purpose of 301, may be resorted to in order to find the rule that will best effectuate the federal policy. * * * Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights.'
 
 
 23
 We think that the remedy fashioned by the district court here is rooted in and supported by fundamental principles of law, and is in furtherance of and in harmony with our national labor policy.
 
 
 24
 The defendants are precluded from asserting that union dues are not a proper element of damages. In a pretrial memorandum on scope of relief, defendants said: 'In accordance with these principles, the union is limited to recovery of the dues lost by virtue of the alleged breach of the contract. In total, these must be limited to the period during which the contract still had to run, to wit, until December 31, 1957.' This, we think, constituted an acceptance by defendants of union dues as an element of damages. Consistent therewith, the defendants did not thereafter raise that question at any stage of the proceedings. The testimony of the union's financial secretary on the amount of union dues collected from employees at the Philadelphia plant, which formed the basis for the compensatory award, went unchallenged. In any event, our decision in Burlesque Artists Ass'n v. I. Hirst Enterprises, Inc., 267 F.2d 414 (C.A. 3, 1959), supports reliance on union dues as an element of damages. There plaintiffs, a group of employees constituting the Burlesque Artists Association, sued for breach of a contract wherein defendant, a theatre owner, had agreed that every person appearing in certain theatres would be required to join the association. This court upheld a jury award of damages based on the testimony of an expert witness who estimated the amount of union dues that the association would have received had all of defendant's employees joined the association as the contract required.
 
 
 25
 A defendant in a breach of contract action is liable for all damage resulting from the breach that could have been fairly and reasonably contemplated by the parties to the contract at the time of its execution. Hadley v. Baxendale, 9 Exc. 339 (1854). That rule has been followed in the federal courts, Bercut v. Park, Benziger & Co., 150 F.2d 731 (C.A.9, 1945); Wilson & Co. v. United Packinghouse Workers, 181 F.Supp. 809 (N.D.Iowa, 1960); Oliver-Electrical Mfg. Co. v. I. O. Teigen Construction Co., 177 F.Supp. 572 (D.Minn.1959); W. L. Mead Inc. v. International Brotherhood of Teamsters, etc., Local Union No. 25, 129 F.Supp. 313 (D.Mass.1955), affirmed 230 F.2d 576 (C.A.1, 1956); Ring v. The Dimitrios Chandris, 43 F.Supp. 829 (E.D.Pa.1942), affirmed 133 F.2d 124 (C.A.3, 1943); those of Pennsylvania, F. P. Weaver Coal Co. v. Maryland Casualty Co., 295 Pa. 486, 145 A. 595 (1929); Siegel v. Strubel Bros., Inc., 150 Pa.Super. 343, 28 A.2d 352 (1942); Stevenson v. Smith, 82 Pa.Super. 539 (1924), and is generally accepted in other jurisdictions. Restatement, Contracts 330 (1932); 6 Williston, Contracts, 1344, 1347 (rev. ed. 1937).
 
 
 26
 This case comes squarely within that rule. It was clearly foreseeable at the time the collective bargaining agreement was entered into that if the company terminated its operations at the Philadelphia plant, the union would lose its duespaying members. Because of the mobile nature of the shoe industry, where the ratio of labor to capital is high, the union was vulnerable to destruction by a relocation. Paragraph 21 was inserted in the instant, and in fact all of the agreements executed between the company and union, in order to protect it against just such a contingency.
 
 
 27
 The district court's finding that the company-union relationship would have continued for an additional twenty years is not clearly erroneous and is fully supported by the record. The company had been a Goldenberg-family-controlled operation for approximately forty years, and the union, since 1937, represented its employees in Philadelphia and negotiated agreements in their behalf. Michael Goldenberg, the present owner of Brooks Shoe Manufacturing Company, Inc., has shown a persistent interest in its continuation, and certainly there is no present prospect of liquidation. The manufacturing operation at Hanover increased substantially during relevant times, and shows every sign of remaining vigorous. There is no basis in the record for concluding that repeated contracts would not have been successfully negotiated between the company and the union, and it has never been suggested that the union did not represent a majority of the employees, nor has an election ever been sought for selection of a new bargaining representative.
 
 
 28
 Whether defendants are entitled to a reduction in damages to present worth or credit for certain savings allegedly accruing to the union because it need not any longer provide services to its members, or for the alleged failure of the district court to allow defendants certain other credits, are questions we need not reach since they were neither raised nor disposed of below. These contentions involve a resolution of factual issues which we cannot and should not reach here. Compare McNello v. John B. Kelly, Inc., 283 F.2d 96 (C.A.3, 1960), where the error in the district court was termed 'fundamental' by us. In International Telephone and Telegraph Corp. v. Local 400, 286 F.2d 329, n. 9 (C.A.3, 1960), there were no factual issues to resolve, and the court was determining its jurisdiction.
 
 
 29
 As a general rule, punitive damages are not recoverable in an action for breach of contract.[2] One of the exceptions to this rule is well recognized in many jurisdictions. This exception is particularly pertinent here. It is in those cases where a defendant's conduct constitutes a breach of contract and disregard of a duty imposed by law independently of contract.[3]
 
 
 30
 The achievement of industrial stability has for many years been of major concern to the Congress of the United States. It has expressly declared that our national labor policy favors unionization and the execution and observance of collective bargaining agreements between employers and employees as a means of realizing that end. 29 U.S.C.A. 151. Congress demonstrated the importance of faithful performance of those agreements when it enacted 301(a). The Act's legislative history also shows the persistent concern of officials in both the executive and legislative branches of government for the availability of effective remedies to an aggrieved party when a breach occurs. S. Report No. 105, 80th Cong., 1st Sess., 1947; 92 Cong.Rec. pp. 4265, 4410, 80th Cong., 1st Sess., 1947. That history goes on to indicate, S. Report No. 105, supra, p. 30, that 301(a) is to be read in conjunction with 8 of the Act, 29 U.S.C. 158, where it is provided that,
 
 
 31
 '(a) It shall be an unfair labor practice for an employer--
 
 
 32
 '(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *.'
 
 
 33
 As we indicated earlier, the company's breach of the runaway shop provision of the contract had its genesis in the secret, written agreement, executed between John and Michael Goldenberg in 1954. This called for termination of operations at the Philadelphia plant at the earliest possible date. In the ensuing years, the company systematically and deviously carried out its plan of removal. At the same time, it renewed on several occasions, between 1954 and 1957, its agreement with the union. Such conduct on the part of defendants is not only a willful breach of its collective bargaining contract, but also constitutes a flagrant violation of duties imposed by the Labor Management Relations Act, 1947, 29 U.S.C.A. 141 et seq. It is difficult to conceive of conduct calculated to destroy more effectively the national labor policy. Such violation of defendants' duties supplies a sufficient legal basis for the imposition of punitive damages, and the award of such damages here was without doubt proper.
 
 
 34
 The defendants rely heavily on United Mine Workers of America v. Lambert, 214 F.2d 487 (C.A.4, 1954), and United Mine Workers of America v. Patton, 211 F.2d 742, 47 A.L.R.2d 850 (C.A.4, 1954), which are inapposite. These actions were brought under 303(b), 29 U.S.C.A. 187(b) of the Act which expressly limits a plaintiff's recovery to 'the damages by him sustained and the cost of the suit,' thereby precluding an award of punitive damages which, by their nature, are not compensatory. Section 301(a), of course, contains no such limitation.
 
 
 35
 BIGGS, Chief Judge (concurring in part and dissenting in part).
 
 
 36
 I concur in the opinion as written by Judge STALEY in all respects save one. I cannot accept the proposition that punitive damages may be imposed on Brooks. Section 303 of the Labor Management Relations Act, as amended, 29 U.S.C.A. 187 (1960 Supp.), indicates that Section 301 of the Act, 29 U.S.C.A. 185 (1956), does not contemplate the imposition of punitive awards. Congress in dealing with the tortious conduct prohibited by the Act clearly limited recovery to compensatory damages and costs. Note the language of Section 303(b) which provides that the injured employer 'shall recover the damages by him sustained and the cost of the suit.' See United Mine Workers of America v. Patton, 211 F.2d 742, 749-750, 47 A.L.R.2d 850 (4 Cir.), cert. denied 348 U.S. 824, 75 S.Ct. 38, 99 L.Ed. 649 (1954). If my assumption be correct Congress should not be credited with the intention of authorizing punitive awards for causes of action arising under Section 301, the contract section, of the law. It is the general policy of the federal labor laws, to which the federal courts are to look for guidance in Section 301 actions, to supply remedies rather than punishments. This was indicated by the Supreme Court in Republic Steel Corp. v. N.L.R.B., 311 U.S. 7, 10-13, 61 S.Ct. 77, 85 L.Ed. 6 (1940).
 
 
 37
 Although the legislative history on this issue is meager, the following interchange between Representatives Barden and Hartley on the floor of the House does suggest that the type of relief contemplated under Section 301 was remedial as distinguished from punitive: 'Mr. Barden. * * * It is my understanding that section (301) * * * contemplates not only the ordinary lawsuits for damages but also such other remedial proceedings, both legal and equitable, as might be appropriate in the circumstances * * *.'; 'Mr. Hartley. The interpretation the gentleman has just given of that section is absolutely correct.'[1]
 
 
 38
 From the foregoing it follows that the fashioning of a remedy by the United States courts in Section 301 actions, as required by Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), does not include the power to award punitive damages.
 
 
 39
 KALODNER, Circuit Judge.
 
 
 40
 I agree that there was a proper finding in the District Court of a breach of the collective bargaining agreement and that compensatory damage may be awarded as a result.
 
 
 41
 I disagree, however, with the view that (1) compensatory damages may be awarded for a period beyond the expiration date of the collective bargaining agreement here involved, and (2) punitive damages may be imposed in an action under Section 301(a) for breach of a collective bargaining agreement.
 
 
 42
 First as to compensatory damages: Judge STALEY premises his view that damages may be awarded for a period of 20 years beyond the expiration date of the agreement on the ground that the employer in the instant case had bargained collectively with the union for a period of 20 years prior to the breach and that 'the foreseeable duration of the company's relationship with union' was a minimum of an additional 20 years from the date of the District Court's adjudication.[1] In doing so, he subscribes to the District Court's 'life expectancy' formula for employer-union relations which is without precedent. That formula completely overlooks the fact that at the expiration of the collective bargaining agreement the employer would have been free to cease coperations completely at its plant in Philadelphia for any number of legitimate business reasons such as, for example, the desire to conduct its business in a more favorable tax climate in some other state.
 
 
 43
 The only limitation upon the right of the company to leave Philadelphia at the expiration of the existing agreement would be such as could be imposed under the provisions of the National Labor Relations Act. See A.L.R.A. 8(a)(5), 29 U.S.C.A. 158(a)(5) (refusal to bargain). If the action of the company in so leaving Philadelphia would constitute an unfair labor practice, then it might be ordered by the NLRB to return to its original location or to offer jobs to its old employees at its new location, paying them for the cost of relocation.
 
 
 44
 It is my ivew that implicit in the award of compensatory damages beyond the expiration date of the agreement is a determination that the company could never, without committing an unfair labor practice, leave Philadelphia at the expiration of the agreement. It need only be pointed out that the adjudication of unfair labor practices was committed in the first instance by Congress to the NLRB.
 
 
 45
 This too must be said. Since the District Court found, and everyone agreed, that the company was trying to close up its Philadelphia business as soon as practicable, there is no basis whatever for a factual inference that the collective bargaining agreement would have been renewed beyond its expiration date, December 1, 1957. Indeed, the logical inference is exactly to the contrary. Thus, the award of damages for years subsequent to 1957 is worse than speculative; it is contrary to the evidence. For the reasons stated I would limit the award of compensatory damages to the loss of union dues which would accrue during the term of the collective bargaining agreement which expired December 1, 1957.
 
 
 46
 Second, as to the District Court's award of punitive damages:
 
 
 47
 I disagree with the view that Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), stands for the proposition that the federal courts may 'fashion' a remedy which will embrace punitive damages.
 
 
 48
 Judge STALEY recognizes that 'As a general rule, punitice damages are not recoverable in an action for breach of contract,' but makes an exception here because the breach of contract was in 'disregard of a duty imposed by law independently of contract', to writ, Section 8 of the National Labor Relations Act.
 
 
 49
 On this score one needs go no further in a Section 8 violation, it was said: Corp. v. N.L.R.B., 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940) where it was held that punitive damages cannot be imposed by the National Labor Relations Board in a Section 8 violation, it was said:
 
 
 50
 'We think that the theory advanced by the Board proceeds upon a misconception of the National Labor Relations Act, 29 U.S.C.A. 151 et seq. The Act is essentially remedial. It does not carry a penal program declaring the described unfair labor practices to be crimes. The Act does not prescribe penalties or fines in vindication of public rights or provide indemnity against community losses as distinguished from the protection and compensation of employees. Had Congress been intent upon such a program, we cannot doubt that Congress would have expressed its intent and would itself have defined its retributive scheme.' 311 U.S. at 10, 61 S.Ct. at 79.
 
 
 51
 The holding in Republic Steel was reaffirmed by the Supreme Court in Local 60, United Brotherhood of Carpenters and Joiners of America, AFL-CIO v. N.L.R.B., 365 U.S. 651, 655, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961). It was there said:
 
 
 52
 'The Board has broad discretion to adapt its remedies to the needs of particular situations so that 'the victims of discrimination' may be treated fairly. See Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 174 (61 S.Ct. 845, 852, 85 L.Ed. 1271). But the power of the Board 'to command affirmative action is remedial, not punitive * * *. " 365 U.S. at 655, 81 S.Ct. at 877.
 
 
 53
 The foregoing establishes that the 'duty imposed by law' (the Act) independently of contract does not permit the imposition of punitive damages even by the agency to which Congress has entrusted the enforcement of the Act.
 
 
 54
 For the reasons stated I would reverse the judgment of the District Court insofar as it relates to the imposition of compensatory damages beyond December 1, 1957, the date of termination of the collective bargaining contract here involved, and insofar as it relates to the imposition of punitive damages.
 
 
 55
 Judges GOODRICH, HASTIE and SMITH concur in the views expressed in this opinion.
 
 
 
 [1]
 In this regard, the company refers us to Local Lodge No. 1898 of Dist. No. 38 of International Ass'n of Machinists, A.F. of L. v. Brake & Electric Sales Corp., 279 F.2d 590 (C.A.1, 1960), and Simadiris v. Hotel Waldorf Astoria Corp., 144 N.Y.S.2d 136 (S.Ct.1955), which are no help for in those decisions the trial courts expressly found that the plaintiffs, with full knowledge, condoned the acts which they relied on to establish a breach
 
 
 [2]
 5 Corbin, Contracts, 1077 (1951); 1 Sedgwick, Damages 370 (1912); McCormick, Damages 81 (1935); 5 Williston, Contracts, 1340 (rev. ed. 1937); Restatement, Contracts 342 (1932)
 
 
 [3]
 E.g., Scalise v. National Utility Service, Inc., 120 F.2d 938 (C.A.5, 1941) (violation of statute in obtaining corporate charter); Sommerville v. Chesapeake & Potomac Telephone Co., 49 App.D.C. 3, 258 F. 147 (1919) (discontinuance of telephone service not willful and deliberate, punitice damages denied under circumstances); Burrus v. Nevada-California-Oregon Ry., 38 Nev. 156, 145 P. 926, L.R.A. 1917D, 750 (1915) (delay in operating train); Webb v. Atlantic Coast Line R. Co., 76 S.C. 193, 56 S.E. 954, 9 L.R.A.,N.S., 1218 (1907) (failure to deliver baggage); Pittsburgh, C. & St. L. Ry. Co. v. Lyon, 123 Pa. 140, 16 A. 607, 2 L.R.A. 489 (1889) (refusal to deliver baggage); Southwestern Gas & Electric Co. v. Stanley, 123 Tex. 157, 70 S.W.2d 413 (1934) (termination of electrical services); Hall v. St. Louis-San Francisco Ry. Co., 224 Mo.App. 431, 28 S.W.2d 687 (1930) (failure to provide letter of discharge). See 5 Corbin, Contracts 1077 (1951)
 
 
 [1]
 93 Cong.Rec. 3656-3657, quoted by Mr. Justice Douglas in Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 445-456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957)
 
 
 [1]
 The District Court although it contrived a 20 year 'life expectancy' for the tenure of future bargaining between the employer and the union which it premised on the circumstance that they had bargained collectively for a twenty-year period prior to the December 1, 1957 termination date of the violated agreement, actually awarded compensatory damages for loss of union dues for a period of almost twenty-three years. This is established by the fact that it first calculated the loss of union dues at $1,188 per year and multiplying that sum by twenty years made an award of 'future loss of union dues of $23,760' and then made an award of $3,333 for loss of union dues at the rate of $1,188 a year for the period between December 1, 1957 and the date of its adjudication on September 22, 1960. This additional amount was included in the supplemental award of $4,251 which the District Court made; the difference between the $3,333 and the $4,251 was made up of loss of union dues during the term of the bargaining agreement by reason of 'lay-offs' of union members